TRACY LYNN CONGLETON and
RITA JOHNSON,

                              Plaintiffs,                    OPINION AND ORDER

        v.                                                  16-cv-412-wmc

ONEIDA COUNTY, KEITH FABIANSKI,
LISA CHARBARNEAU, JOHN SWEENEY,
GRADY HARTMAN, and MARC NEUMAN,

                              Defendants.

---

Plaintiffs Tracy Lynn Congleton and Rita Johnson, both former employees of the

Oneida County Sheriff's Department, allege that Keith Fabianski, a fellow jail employee

and, at times during their respective employment, their shift supervisor, subjected them to

hostile treatment because of their sex.  Plaintiffs assert claims for hostile work environment

and retaliation against:  their employer, the County, in violation of Title VII, 42 U.S.C.

§§ 2000e *et seq.*, and against Fabianski and other individual defendants, who are also

employees of the County, as well as the County itself under *Monell v. Department of Social

Services of the City of New York*, 436 U.S. 658 (1978), for violations of their rights under the

Equal Protection Clause of the United States Constitution.

Before the court is defendants' motion for summary judgment, in which defendants

assert a number of bases for judgment in their favor.  (Dkt. #17.)[1]  For the reasons that

follow, the court will grant summary judgment to defendants on all of plaintiffs' claims,

---

[1] Also before the court is plaintiffs' motion to disregard new arguments in defendants' reply brief.
(Dkt. #41.)  Because the court is unpersuaded by any of these purported "new arguments" in
granting partial summary judgment in defendants' favor, the court will deny plaintiffs' motion to
strike as moot.

save one: plaintiff Congleton's claim against the County under Title VII for a hostile work environment. Plaintiff may, therefore, proceed to trial on that claim alone.

## UNDISPUTED FACTS[2]

### A. Defendants

Oneida County is located in North Central Wisconsin and employs approximately 300 individuals, including 91 employees who work for the County's Sheriff's Department. The Sheriff's Department is responsible for the operation of the County Jail.

Defendant Grady Hartman was hired by the County in 1999 as a Sheriff's Deputy. He was promoted to Sergeant in 2006, appointed as Sheriff in 2013 and has won reelection since that time. Defendant Mark Neuman was hired as Oneida County's Jail Administrator on January 21, 2014, replacing Sandra Ladu Ives. He continues in that role today. Neuman's assistant is defendant Keith Fabianski, who was first hired as a Department Corrections Officer in June 1999, having previously served in the United States Marine Corps. Fabianski was promoted to Lead Corrections Officer on August 9, 1999. On November 6, 2013, Fabianski was promoted to Assistant Jail Administrator, the position he has held to this day.

Defendant Lisa Charbarneau was hired by the County in 1993 as the Employee Services Manager for the Labor Relations and Employee Services Department. She was promoted in 2011 to the Human Resources Director. Defendant John Sweeney was hired

---

[2] Unless otherwise noted, the court finds the following facts to be material and undisputed when viewed in the light most favorable to the non-moving parties.

by the County in 1985. He was promoted to Chief Deputy Sheriff in 2000 and remained in that position until March 2014, when he retired from the Department.

Oneida County Corrections Officers are uniformed members of the Sheriff's Department, response for the day-to-day operation of the Jail. Corrections Officers work under the guidance and direction of Lead Corrections Officers. Lead Corrections Officers, however, do not have the authority to hire, fire, discipline or discharge Corrections Officers. Lead Corrections Officers report to the Assistant Jail Administrator and Jail Administrator, who are themselves supervised by the Chief Deputy and Sheriff. The Sheriff has the ultimate authority to hire, fire, discipline and discharge Department employees.

### B. Plaintiffs

Plaintiff Tracy Congleton applied for a position with the Oneida County Sheriff's Department in November 2001. After being offered both her choice of Corrections Officer and Dispatch positions, she opted for the former and began working for the County on January 3, 2002. Based on the recommendations of the then-Sheriff and Chief Deputy, as well as the Jail Administrator and Assistant Jail Administrator Kaye Juel and Sandra Ladu Ives, respectively, Congleton was promoted to Lead Corrections Officer in April 2012, with a rank of Sergeant. Congleton remained in that position, working opposite Lead Correctional Officer Fabianski, until November 8, 2013, at which time she began working as a County Child Care Specialist and defendant Fabianski was promoted to Assistant Jail Administrator. The parties' dispute the events surrounding her transfer of employment, but agree that Congleton resigned from her employment with the County on June 24, 2015.

The County hired plaintiff Rita Johnson as a Corrections Officer on December 6, 1999, and she remained in that role until she was terminated on January 6, 2015. At various times, Johnson worked as the "acting Sergeant," whose responsibilities included supervising then-Lead Corrections Officer Fabianski.

### C. Alleged Harassment

The parties agree that defendant Fabianski made no overt gender-related hostile remarks or slurs. Instead, plaintiffs claim that Fabianski treated them with hostility because they were women. Plaintiff Tracy Congleton reports that Fabianski was the first sergeant under whom she was assigned after six months of training. She found Fabianski to be "very demeaning, always acting like she did not do things properly," though she acknowledges that he always gave her good written reviews. (Pls.' Add'l PFOFs (dkt. #40) ¶ 14.) Specifically, Congleton recounts that at the start of her shift, she would say something like, "Hi, Keith, how are you?," to which he would respond, "What the fuck does it matter to you?," or "Why the fuck do you care?" (*Id.* at 16.) Congleton also recalls that if she was having a conversation with another coworker in front of Fabianski, he would say something like, "Stop . . . interrupting me. You don't fucking interrupt me. You shut up. When I'm talking, you don't interrupt me." (*Id.* at 17.)

Congleton also avers that when Fabianski spoke to her in a hostile fashion, their toes were touching and he would point his finger at her, while saying something like, "If I fucking wanted you to fucking talk, I'd fucking ask you." (*Id.* at ¶ 19.) Congleton further avers that Fabianski cursed at her in front of inmates, including on one occasion when he threw his arms up and said, "What the fuck are you doing?" as she escorted an inmate with

another correctional officer. Congleton represents that she feared for her safety and was afraid Fabianski might physically assault her.

Congleton represents that these interactions happened at least once or twice a week during the time Fabianski was supervising her, from approximately 2002 until 2007, except when Fabianski ignored her completely. She also avers that his behavior never improved over that five-year period of time.

In contrast, Fabianski denies treating Congleton in a hostile manner. In addition to disputing Congleton's account of her interactions with Fabianski, defendants also point out that during the five-year period at issue from 2007 to 2012, Congleton and Fabianski rarely had contact at work. In fact, beginning in 2007, Congleton was no longer supervised by Fabianski; instead, she gained enough seniority to move to a shift supervised by Sergeant Rita Wege (nee Mertz). After staying on Wege's shift from 2007 to 2008, Congleton was asked by then-Jail Administrator Kaye Jule to move to Sergeant Bill Skubal's shift. In 2012, Officer Congleton's schedule was again changed so that she worked three days with one sergeant and three days with another, bringing her back in regular contact with Fabianski. This contact was also short-lived, however, because Congleton was promoted in April 2012 to the rank of sergeant and served as a Lead Corrections Officer herself. Still, Congleton contends that Fabianski was critical and blamed her for things she had not done even after her promotion.

In addition to experiencing Fabianski's hostility directly, Congleton also observed his treatment of other female employees. Specifically, Congleton described an incident when Fabianski did not send officers into the booking room to help female correctional

officer Nicole Martinson. At another time, when Martinson asked Fabianski how she was doing, Fabianski responded, "Who the fuck cares?"

Plaintiff Rita Johnson's first supervising sergeant was also Fabianski. He remained her regular shift sergeant for approximately one year. She continued to work under his supervision "on and off" throughout her career at the Jail. Johnson also avers generally to the differences in the way Fabianski treated her as compared to male correctional officers. As an example, she recounts how Fabianski used "awful" language -- "fuck this," or "fuck that" -- when speaking to female correctional officers. (Pls.' Add'l PFOFs (dkt. #34) ¶ 98.) In contrast, Johnson observed him speaking normally with male correctional officers, calling them "buddy." If Johnson extended a friendly greeting, Fabianski would respond with a "[w]hat the fuck is it to ya?" (*Id.* at ¶ 102.)

Johnson specifically describes an exchange after Fabianski returned from a medical leave of absence in 2002, but not in uniform. Johnson reports asking what he was doing back at work, to which he responded, "Fucking here, ain't I?" He then further said, "If you have a problem [with me being out of uniform,] take it up with the fucking Jail Administrator." (Defs.' PFOFs (dkt. #19) ¶ 115 (quoting Lopez Decl., Ex. J (dkt. #24-10) 5-7); *see also* Pls.' Add'l PFOFs (dkt. #34) ¶ 106.) Later that same day, Johnson overheard Fabianski tell an inmate, "I fly like an eagle and have to work with a fucking turkey." (Defs.' PFOFs (dkt. #19) ¶ 116; Pls.' Add'l PFOFs (dkt. #34) ¶ 106.) When Johnson then approached, Fabianski said that he would speak with her later in the radio room. When Fabianski returned to the locked radio room, he allegedly yelled, "open this fucking door," to which Johnson replied, "if you ask nicely[,] I will open it." (*Id.*) Fabianski

then apparently walked away rather than do so. Although that ended the incident, Johnson maintains it was typical of the dismissive way Fabianski dealt with her, as well as other female correctional officers.

As another example, Johnson specifically recounts one incident when Fabianski told Congleton to "Shut the fuck up. I didn't ask you to talk. There's sergeants in here." (Pls.' Add'l PFOFs (dkt. #34) ¶ 111.) Johnson further recounts an event in December 2013 after Johnson had cleaned and rearranged the break room, and another officer put the furniture back to its original position. Johnson overheard another officer ask Fabianski why they could not keep the break room the way Johnson arranged it. Fabianski asked Johnson to step into his office, at which time he said, "It's always fucking something with you. Every day, it's something. It's always fucking something with you." (Pls.' Add'l PFOFs (dkt. #34) ¶ 115.) Johnson claims she reported this incidence verbally to the County's Employee Services Manager Charbarneau, as well as Neuman, Deputy Sheriff Sweeney and Sheriff Hartman.

In addition to Congleton and Johnson, Sergeant Rita Wege testified at the ERD hearing about Fabianski's interactions with female employees under his supervision, describing Fabianski as demeaning and reducing female correctional officers to tears. Wege specifically observed him mistreating Congleton. Wege also heard complaints from other female officers, Rebecca Hable and Nicole Martinson. As for herself, Wege testified that she made a report to the Jail Administrator that Fabianski yelled at her in 2008.

Sergeant William Skubal also testified at the ERD hearing that in 2009 and 2010, there were a few times when Congleton talked to him "about what [Fabianski] was doing

and [sought] his advice." (Defs.' Resp. to Pls.' PFOFs (dkt. #39) ¶ 179.) In addition, Skubal acknowledged he observed Fabianski dealing with female correctional officers in a demeaning tone and using offensive language approximately once or twice every two weeks. Although he also testified that Fabianski used profanity and had a harsh demeanor with male employees. Skubal testified that Fabianski was harsher with female employees. While Skubal orally complained about Fabianski, those complaints concerned how Fabianski "treated several of us," including Skubal himself.

In response, defendants identify times during each plaintiffs' employment when they had the option to select shifts, and they both opted to work under Fabianski's supervision. (*See, e.g.*, Defs.' PFOFs (dkt. #19) ¶ 44, 47.) Congleton concedes that prior to her move to another shift in 2007, she had the option a year or two earlier to move, but opted to stay on Fabianski's shift because she would have more holidays off, which she particularly valued having started a family. Moreover, at the point when she did opt to transfer shifts, she did so despite the fact that it was the least desirable from a scheduling standpoint.

On at least one occasion, Congleton also concedes telling Fabianski that she looked forward to working with him. When supervising plaintiffs, Fabianski always provided favorable reviews in their performance evaluations. Fabianski even defended Johnson in 2012 when she failed to follow the Department's paid time off policy, advocating for her and recommending that she not be disciplined.

Defendants also point out that Johnson asked Fabianski to represent her as a union steward on two or three occasions, although it appears he was the only steward for

correctional officers.  In 2007, Johnson also asked Fabianski to accompany her when she confronted another correctional officer about a dispute.  During that interaction, Fabianski stepped in front of Johnson to protect her, telling the other corrections officer to keep his hands down.  Finally, defendants point to evidence that Congleton and Fabianski socialized outside of work early in her career, including going to dinner with their respective spouses and Congletons' family attending the Fabianskis' Christmas party.

Defendants further represent that Fabianski also did not get along, at least at times, with two male employees, Sergeant Skubal and Officer Paul Erlitz, and that other female employees testified at the hearing that he was *not* demeaning to female employees.

### D. County's Awareness of Complaints against Fabianski

### 1. Early Complaints

In 2002, Congleton and other Corrections Officers complained to then Jail Administrator Juel that Fabianski had a poor attitude and was a difficult supervisor.  Juel and Chief Deputy Sweeney  responded by meeting with Fabianski and counseling him on his attitude and behavior.  Afterward, defendants represent that Fabianski's work performance and attitude improved.  In response, plaintiffs contend that Johnson alerted Jail Administrator Juel shortly after his counseling that Fabianski was "back to his same old games as to how he treats me and Tracy and Dee and Deb and other female officers." (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 66 (quoting Lopez Decl., Ex. F (dkt. #24-6) (ERD hearing transcript) 25.))  Sergeant Skubal similarly testified that Fabianski's treatment of female officers never changed for the better.  (*Id.* (citing Lopez Decl., Ex. F (dkt. #24-6) 57).)

Johnson also represents that during an investigation of another employee's conduct in 2001, she told a former Sheriff about Fabianski's treatment of her. (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 150.) Johnson also contends that she spoke with then-Assistant Jail Administrator Ladu Ives on at least two occasions about Fabianski's behavior, but could not recall the date.[3]

### 2. Fabianski's Promotion

The Jail Administrator position became open after Juel was killed tragically in a fire on February 12, 2013. Oneida County ordinances govern employee promotions, appointments and the filling of vacant positions. Under the applicable policy, a panel interviews and scores candidates, with the Sheriff making the final decision. In fact, Congleton applied for the Jail Administrator positon, but the County hired Ladu Ives, the then-Assistant Jail Administrator.

As a result of Ladu Ives' promotion, the Assistant Jail Administrator position became vacant, and Congleton again applied for that position. Congleton was further informed that she was the only applicant to pass the written examination for that position. Instead of offering her the position, however, the Department reposted it. Ultimately, five

---

[3] Johnson also avers that Ladu Ives was present when she and other female officers met with attorneys in October 2007 about gender-based harassment at the jail, although she does not claim to have raised Fabianski's behavior in particular at that time. For their part, defendants point to Johnson's ERD hearing testimony during which she only claims to have complained to Kaye Juel. (Defs.' Resp. to Pls.' Add'l PFOFs (dkt. #39) ¶ 113.) Johnson also contends that in April 2012, she went to Human Resources Director Charbarneau's office "due to the harassment at the jail and specifically Sergeant Fabianski," at which time she "asked about openings at the courthouse," but Johnson stops short of averring that she actually *told* Charbarneau about harassment. (Pls.' Add'l PFOFs (dkt. #34) ¶ 114.) Finally, Charbarneau avers that her only recollection of Johnson complaining about Fabianski was in connection to the Congleton investigation in November 2013.

candidates, including Congleton and Fabianski, were asked to interview. Around this time, Congleton avers that Fabianski stated while looking directly at her, "Once I become jail administrator, I'm going to fucking start cleaning house." (Pls.' PFOFs (dkt. #34) ¶ 29.) The panel, which included Sheriff Hartman, Deputy Chief Sweeney and Jail Administrator Ladu Ives, interviewed and independently scored the candidates. Sheriff Hartman then took each candidate's raw interview score from each interviewer and averaged them. Fabianski received the highest overall average score; Congleton received the third highest score. During the hiring process, Congleton never raised any concerns about Fabianski's candidacy with anyone at the County. Ultimately, Hartman decided, and the panel agreed, that Fabianski was the most qualified applicant. He was promoted to the role of Assistant Jail Administrator on November 6, 2013.

### 3. Other, Pre-November 2013 reports

Defendants contend that Congleton complained to no one at the County about Fabianski's alleged discrimination based on her gender before the date Fabianski was promoted to Assistant Jail Administrator instead of Congleton. Although Congleton acknowledges that she did not lodge a *formal* complaint under the County's or Department's harassment policies before then, she purports to have complained to supervisors about Fabianski well before November 2013. Specifically, Congleton represents that she spoke about Fabianski's discrimination and/or harassment when Sandra Ladu Ives was still the Assistant Jail Administrator, and that Ladu Ives had herself witnessed the harassment on several occasions well before that, when she was a corrections officer. Congleton also avers that she later told Jail Administrator Kaye Jule about

11

Fabianski's harassment on several occasions.  At some point, Congleton contends that she

no longer felt comfortable reporting harassment to Ladu Ives after Jule's untimely death in

February 2013 because of "how the relationship between Keith [Fabianski] and Sandra

[Ladu Ives] had developed."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #39) ¶ 67 (citing Olson

Decl., Ex. A (dkt. #37-1) 2-3).)  Congleton admits, however, that she did not complain

about harassment based on her gender to then-Deputy Sheriff Sweeney, Sheriff Hartman,

the County Human Resources Director Lisa Charbarneau, or any other County Human

Resources employee before November 8, 2013.

### E. Congleton's Formal November 2013 Complaint of Harassment and Charbarneau's Investigation

On November 8, 2013, the day Congleton learned that she was not selected for the

Assistant Jail Administrator, she met with Charbarneau.  The parties sort of dispute the

specific content of their conversation.  Congleton contends that she relayed:  how upset

she was about the decision to promote Fabianski; her belief that Fabianski and Ladu Ives

had conspired to have Fabianski promoted; and that she did not want to be supervised by

Fabianski.  Congleton also reports asking to be demoted so that she would have somebody

with a sergeant's rank between her and Fabianski.  Defendants emphasize that Congleton

did not provide any specific examples, only stating generally that Fabianski talked to her

in a "harsh manner."  (Defs.' PFOFs (dkt. #19) ¶ 109.)  In response, Congleton represents

that she told Charbarneau "[e]verything that [she] could remember," citing her ERD

testimony, but fails to provide any *details* as to what she told or did not tell Charbarneau

about Fabianski's alleged harassment.  (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 109.)

Congleton also urged Charbarneau to speak with Johnson and another employee Debra Nelson about Fabianski's behavior.

After learning that Congleton would be uncomfortable working under Fabianski, Charbarneau placed her on administrative leave to allow the County to investigate the allegations. At that time, Charbarneau also indicated that there was an opening available in the County child support office for which Charbarneau believed Congleton was more than qualified.

Charbarneau's investigation lasted approximately five days. Plaintiffs point out that there are no written guidelines on how to conduct an investigation, and Charbarneau had no training on how to do so. Plaintiffs generally challenge the sufficiency of Charbarneau's investigation, pointing out in particular that she did not ask: about the frequency of any harassment; whether there was other witnesses to it; and for records to substantiate the harassment. Plaintiffs also criticize Charbarneau for not following up with potential witnesses who had heard complaints about the harassment.

Even so, Charbarneau represents that she spoke with five individuals, including Congleton and purported co-complainers Johnson and Nelson. Defendants contend that Johnson reported only the one incident in 2002, following Fabianski's return from a medical leave of absence, not in uniform. Plaintiffs dispute that Johnson only reported this one incident, stating that she reported the same things she testified about at the ERD hearing. (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 115; Pls.' Add'l PFOFs (dkt. #34) ¶ 119.) As to her conversation with Charbarneau, Johnson also does not dispute reporting that Fabianski defended her when another corrections officer yelled at her, nor that she

complained more extensively about other Department employees.

During Charbarneau's discussion with Nelson, Charbarneau acknowledges being told that Fabianski "generally spoke to women differently, [but Nelson] could not provide any incidents of Fabianski's behavior," other than the 2002 incident that Johnson described, and one other exchange on a date she could not recall, when Nelson asked Fabianski, "What did I do to piss you off?" to which he allegedly replied ,"You fucking showed up." (Defs.' PFOFs (dkt. #19) ¶ 121.)

Charbarneau represents that the other individuals she interviewed "stated that Fabianski was sometimes rude, but he acted that way with everyone regardless of gender." (Defs.' PFOFs (dkt. #19) ¶ 122 (citing Charbarneau Decl. (dkt. #21) ¶ 48).) However, Charbarneau, does not identify the "other" individuals with whom she spoke, and plaintiffs dispute whether she actually spoke with anyone else.

Before Congleton's November 8 complaint, Sergeant William Skubal also met with Charbarneau on October 14 to express concerns about Fabianski becoming the Assistant Jail Administrator, and specifically, a concern that Ladu Ives was helping Fabianski apply for the position. Skubal further complained that Fabianski was rude to him personally, but he did not provide any information supporting a claim that Fabianski treated women any differently than he treated men. Plaintiffs dispute this, pointing to Skubal's oral report to Charbarneau in 2009 or 2010 about "Mr. Fabianski's treatment of female corrections officers." (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 124.) Nevertheless, defendants maintain that Skubal's complaints in 2013 were about Fabianski's behavior generally, not specifically about his treatment of female employees.

Based on these interviews, Charbarneau ultimately found that Fabianski sometimes used profanity and was rude, but that he spoke to men and women in the same manner. She further concluded that Fabianski's use of profanity was common in the Jail among and between men and women. In light of Congleton's failure to raise concerns before she was passed over for promotion, as well as the few, specific instances of alleged unfair behavior, Charbarneau concluded that Fabianski's behavior was not gender-related, did not violate County policy and did not constitute harassment or discrimination of Congleton. However, Charbarneau did not memorialize her findings in a written report, purporting to have followed the advice of the County's attorney not to do so.

Charbarneau did, however, advise Congleton of the outcome of her investigation on November 15, 2013. She also advised Congleton that Sheriff Hartman wanted her to stay in the Lead Corrections Officer position. Congleton represents that Charbarneau also advised her that the County's attorney thought it might be best for her to take the child support position, which Congleton opted to do, even though it paid significantly less. Charbarneau granted Congleton's request and arranged for her transfer to a position with Child Support Enforcement, effective November 18, 2013. Congleton then worked in that position for almost 1½ years when on until June 24, 2015, she voluntarily resigned to work for another employer.

### F. Johnson's Termination

In January 2014, a departing employee advised Sheriff Hartman during her exit interview that she felt Officer Johnson had a negative attitude, and she found it hard to work with her. Johnson's direct supervisor, Hubert Lawson, had also received complaints

regarding Johnson's attitude from her coworkers, and he relayed that information to Fabianski, who, in turn, passed it along to Neuman, sometime shortly after Neuman had been hired to replace Ladu Ives as the Jail Administrator.

On January 23, 2014, Jail Administrator Neuman and his Assistant Fabianski met with Johnson to address these complaints. Defendants contend that Neuman told Johnson that he had noted a pattern of her not getting along with coworkers, and he expected she would cooperate and improve her attitude. While Johnson purports to dispute this, her account does not contradict defendants' proposed facts. Instead, Johnson contends that Neuman told her (on what she points out was only his second day on the job) that she was "not a team player and that he would not have that in his department." Johnson inferred Neumann was making a "reference to [her] previous complaints about Sergeant Fabianski which she had made to Juel and Charbarneau." (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 162.) When asked if she had a problem with any coworkers or supervisors, Johnson also avers that she specifically told Neumann of her "history with Sergeant Fabianski," including that she had previously complained to Juel and Charbarneau, but nothing had been done. (*Id.*)

After that meeting, Johnson contacted Charbarneau to emphasize again that she was still interested in a transfer outside of the Sheriff's Department, because she was convinced that the new jail administration (Neumann and Fabianski) was going to look for a way to get rid of her. This conversation was actually a follow-up to Johnson's previous request for a transfer, to which Charbarneau advised that she should apply for any open positions.

Eleven months later, on November 17, 2014, after working nearly half her shift, Johnson provided her supervisor, Sergeant Dave Hollands, a doctor's note stating that she was ill and should not work on November 17 and 18. Johnson explains that the doctor's note was precipitated by a rash on her shoulder that was getting worse during the course of her shift. She nevertheless continued to work on the 17th, but did not report to work on November 18 and was not scheduled to work November 19 or 20. On November 21, Johnson called in sick to work at approximately 1:00 p.m., about five and one-half hour before the start of her scheduled shift.

On November 17, Johnson was also notified that she was scheduled for a mandatory overtime shift on November 30.[4] On November 24, Johnson called Fabianski and, according to defendants, stated that she could not work that overtime shift because her son, who was living on a military base in North Carolina, was visiting for a week. Johnson contends that she did not say that she could not work, but instead requested that Fabianski find a substitute. Regardless, Fabianski told her that he was going on vacation and directed her to contact Neuman.

The parties dispute the specifics after that, but suffice it to say that Neuman and Johnson never connected. Instead, on November 24, Neuman left her a voicemail instructing her to work the mandatory overnight shift on the 30th and to contact him if she had any questions. Rather than try to reach Newman again, Johnson then called Butzlaff, the County Support Services Administrator, and attempted to reach Chief

---

[4] Because of staff shortages, ordering mandatory overtime is often required to meet Wisconsin's jail staffing requirements.

Deputy Dan Hess or Sheriff Hartman. Ultimately, there is no dispute that *none* of these individuals excused her from working the November 30 overnight shift.

On November 30, Johnson called in sick and failed to report to work. Given this history, Neuman suspected she was not ill, but had called in sick to continue the visit with her son. Johnson claims, however, that she was experiencing flu-like symptoms, including nausea and diarrhea. In addition to questioning the legitimacy of her excuse, Neuman also believed that Johnson violated the chain of command by calling the Chief Deputy, rather than communicating with Neuman directly as he had instructed. Given his belief that Johnson was abusing sick leave, he commenced an investigation. Johnson contends that Neuman simply saw this as an opportunity to get rid of her.

As part of his investigation, Neuman interviewed Johnson on December 3, 2014, and ultimately concluded that Johnson had lied to him during the investigation. Neuman also found that she had failed to accept responsibility for her actions, was insubordinate by not communicating directly with him, and had abused sick leave. Johnson disputed Neuman's findings and met with him again on December 22, after which Neuman updated his report and provided it to Sheriff Hartman.

Hartman then conducted his own investigation, including a meeting with Johnson on December 30. At that time, he was unaware that Johnson made any complaints of gender discrimination against Fabianski during her employment. Hartman also concluded that: (1) Johnson had lied during the investigation; and (2) she had violated the Department's policies and procedures by abusing sick leave. As a result, Hartman terminated Johnson's employment effective January 6, 2015.

In response, Johnson filed a grievance. During that process, Johnson did not allege that she was terminated for discriminatory or retaliatory reasons. A hearing was held on Johnson's grievance on April 10, 2015. On April 22, the Hearing Officer denied her grievance and upheld her termination.

### G. Anti-Harassment Policies

Both the County and the Department maintain Anti-Harassment policies, which state that they have zero tolerance for discrimination and harassment. (Charbarneau Decl., Exs. B, C (dkt. ##21-2, 21-3).) Employees receive a copy of the County's policy when hired, and employees receive both County and Department policies during orientation. In addition, the policies are on the Department's internet and can be accessed at any time.

Under the County's policy, any individual who believes that they are the victim of harassment is required to notify his or her supervisor, unless the supervisor is the harasser, in which case the supervisor's supervisor should be notified. If an employee is uncomfortable notifying any supervisor, he or she is directed to contact the County Labor Relations and Employee Services Department. Under the Department's policy, an individual who has been sexually harassed is directed to contact "any supervisor with whom they have confidence." (Charbarneau Decl., Ex. C (dkt. #21-3) 1.) The County investigates all complaints and, if substantiated, appropriate disciplinary action is taken.

## OPINION

Plaintiffs assert claims for (1) hostile work environment under Title VII; (2) retaliation under Title VII; and (3) equal protection violations under § 1983 based on the

same alleged sex discrimination and retaliation. The Title VII claims are brought against Oneida County, as plaintiffs' former employer, and the § 1983 claim is brought against the individual defendants and against the County under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978). Defendants raise several bases for summary judgment, which the court addresses in turn below.

## I. Statute of Limitations

Defendants seek to dismiss plaintiffs' Title VII hostile work environment claims as untimely. Under Title VII, a plaintiff must file a charge with the EEOC or the appropriate state agency -- here the Wisconsin Equal Rights Department ("ERD") -- "within 300 days of the alleged discriminatory act or unlawful practice." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 890 (7th Cir. 2016) (citing 42 U.S.C. § 2000e–5(e)(1)). Congleton filed a discrimination complaint with the ERD against the County on February 17, 2014, thus her claim encompasses events dating back to April 24, 2013. Johnson filed her complaint on August 7, 2015, encompassing claims dating back to October 10, 2014.

In response, plaintiffs concede that Johnson's Title VII hostile work environment claim is time-barred. (Pls.' Opp'n (dkt. #32) 6.) Plaintiffs, however, argue that "a subset" of Congleton's claims are actionable because "Charbarneau's sham investigation and improper exoneration of Fabianski in November, 2013 and Congleton's constructive demotion, are all within the limitations period." (*Id.* at 9.) Even though Fabianski's alleged harassment of Congleton for the most part dates back to the early and mid 2000s, "a violation of Title VII that is based on a claim of harassment by a coworker doesn't occur until the employer has failed to take reasonable steps to bring the harassment to an end."

*Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 666 (7th Cir. 2001). In other words, "only when it becomes clear that the employer has failed to resolve it in a timely fashion does the statute of limitations begin to run." *Id.* Therefore, plaintiffs reason that the clock for purposes of Congleton's hostile work environment claim did not begin to run until November 15, 2013, when Charbarneau informed Congleton of the results of her investigation and Congleton decided to accept the transfer to a lower paying job.

To this, defendants offer a convoluted reply, essentially arguing that the statute of limitations should not be tolled by Charbarneau's investigation. (Defs.' Reply (dkt. #38) 10.) To be fair, plaintiffs also cite to cases involving the tolling of the statute of limitations. (Pls.' Opp'n (dkt. #32) 10.) This case, however, does not involve the tolling, which may be appropriate in cases where the plaintiff was lulled into believing that the employer was attempting to take remedial actions. *See Frazier*, 263 F.3d at 666. Instead, plaintiff Congleton's ERD complaint was filed within 300 days of Charbarneau's notification of the results of her investigation, finding Congleton's complaints about Fabianski unsubstantiated.

Defendants persist that Congleton claims, and therefore was aware of, Fabianski's behavior dating back to 2002. (Defs.' Reply (dkt. #38) 11.) While this argument would certainly seem to carry weight with respect to the scope of her claims under § 1983 against *Fabianski* as discussed later, Congleton's Title VII claim is triggered by the date the *employer* fails to take corrective action, *not* when the alleged harassment began. *See Frazier*, 263 F.3d at 666 (statute of limitations begins to run "only when it becomes clear that the employer

has failed to resolve it in a timely fashion").[5]

Accordingly, the court will grant summary judgment to defendants on Johnson's Title VII hostile work environment claim as time-barred, but must deny defendants' motion as to its statutory limitations defense as to Congleton's claim. Defendants only pursue a statute of limitations defense with respect to plaintiffs' Title VII hostile work environment claim in its summary judgment submissions, and not, as far as the court can tell, with respect to the § 1983 equal protection claims brought against the individual defendants. The statute of limitations for the § 1983 claims is significantly longer at six years than that provided under Title VII. S*ee Gray v. Lacke*, 885 F.2d 399, 408-09 (7th Cir. 1989) (citing Wis. Stat. § 893.53, providing statute of limitations for personal rights actions). Still, in their opposition brief, plaintiffs concede that the relevant period of time for their equal protection claims is the six-year period of time before commencement of this action, in other words, alleged harassment *after* June 14, 2010. (*See* Pls.' Opp'n (dkt. #32) 6 ("Thus, each Plaintiff can reach back to Fabianski's harassment of her, which was occurring during this six-year limitations period, *i.e.*, after June 14, 2010, six years before this action was commenced.").) As described above in the fact section, plaintiffs' allegations of harassment by Fabianski largely concern the period of 2002 to 2007 for Congleton and the early 2000s for Johnson. For the reasons explained below, this timing

---

[5] In proposing findings of facts, plaintiffs stress earlier complaints about Fabianski in 2002, as well as more recent complaints preceding the November 2013 investigation. Curiously, however, other than acknowledging earlier complaints that were not specific to gender harassment lodged against Fabianski in 2002, defendants dispute any earlier awareness of plaintiffs' sex harassment claims. As a result, the court must assume that defendants are *not* arguing that Congleton's Title VII claim is time-barred because she previously informed the County of her concerns and the County failed to take corrective action at that time.

dynamic proves fatal for plaintiffs' equal protection claims asserted against Fabianski individually.

## II. Merits of Title VII Hostile Work Environment Claim and Equal Protection Clause Claim

Next, defendants argue that plaintiffs failed to put forth sufficient evidence from which a reasonable jury could find harassment implicating Title VII and the Equal Protection Clause. For the most part, the parties agree that the same standard of proof governs plaintiffs' Title VII hostile work environment claim and their equal protection claims against individual defendants brought under 42 U.S.C. § 1983, though plaintiffs acknowledge that their § 1983 claim also requires proof of "discriminatory intent." (*See* Defs.' Opening Br. (dkt. #18) 36 (citing *Williams v. Seniff*, 342 F.3d 774, 788-89 n.13 (7th Cir. 2003); Pls.' Opp'n (dkt. #32) 26 (quoting *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001).)[6] Because the statute of limitations defense argument was specific to the Title VII claim, and therefore only bars plaintiff Johnson's claim under Title VII, the court must consider defendants' merits-based challenges to both plaintiffs' claims.

"Title VII prohibits the creation of a hostile work environment." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Vance v. Ball State Univ.*, —— U.S. —— ——, 133 S. Ct. 2434, 2441 (2013)); *see also Valentine v. City of Chi.*, 452 F.3d 670, 682 (7th Cir. 2006) ("Sexual harassment by a state employer constitutes sex discrimination in

---

[6] Of course, there are other differences. For the § 1983 claims, plaintiffs need not show a basis for employer liability, unless pursuing a claim under *Monell*, which plaintiffs withdrew in their opposition brief. (Pls.' Opp'n (dkt. #32) 9.) Moreover, a showing that plaintiffs' sex was simply a "motivating factor" in, rather than a "but for" cause of, Fabianski's alleged harassment might still form a sufficient basis for some relief under Title VII. *See* 42 U.S.C. § 2000e-2(m).

violation of the equal protection clause."). In order to avoid summary judgment on a hostile work environment claim, "a plaintiff must establish four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) her gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell*, 759 F.3d at 773 (internal quotation marks omitted) (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)).

## A. Subjectively and Objectively Offensive; Severe or Pervasive

Because the parties' arguments as to whether Fabianski's behavior was objectively offensive (part of the first prong) and severe or pervasive (the third prong) overlap, the court will consider these two elements together. Defendants contend that Fabianski's behavior was neither subjectively nor objectively offensive and that it was neither severe nor pervasive. In support of their position that Fabianski's behavior was not *subjectively* offensive, defendants point to evidence in the record that: (1) at times, plaintiffs opted to work under his supervision; (2) sometimes Fabianski was nice to them, including (a) with respect to Johnson, acting as her union representative or otherwise supporting her in confronting other co-workers, and (b) with respect to Congleton, socializing with her and her husband, offering gifts to her children, which she accepted, and inviting her and her family to family holiday parties; and (3) he provided positive performance reviews of both plaintiffs. (Defs.' Opening Br. (dkt. #18) 26-27.)

Nevertheless, as detailed above, Congleton testified at the ERD hearing in detail that Fabianski frequently and consistently spoke to her in a demeaning manner, recounting

Fabianski's use of derogatory language to address her. Specifically, Congleton testified that while he was supervising her, Fabianski spoke to her in a derogatory manner once or twice a week, and provided examples of Fabianski responding, "What the fuck does it matter to you?," or "Why the fuck do you care?" Each of these responses were supposedly prompted by no more than simply asking him how he was doing, as were responses like "shut up" and to stop "fucking interrupt[ing] me," among other purported statements. Congleton also represents that when Fabianski spoke to her in this manner, he would do so in close proximity, with their toes touching and his finger pointed at her. Congleton further testified that she feared for her safety and was concerned that Fabianski might physically assault her during these exchanges. A reasonable jury could credit her testimony and find that she found this treatment subjectively offensive.

Plaintiff Johnson's testimony is far less detailed, relying on her observations generally of differences in the way Fabianski treated her and the way he treated male correctional officers, as well as recounting Fabianski being demeaning to women and using "awful" language, including "fuck this," or "fuck that," when speaking to female correctional officers, in contrast to how he spoke with male correctional officers. Johnson recalled a specific event in 2002 -- the so-called "radio room" incident -- during which Fabianski allegedly cursed at her after pointing out that he was not in uniform and referred to her as a "fucking turkey." There was also the bizarre comment by Fabianski in December 2013, after Johnson had rearranged the furniture in the break room. Unlike Congleton, however, other than to testify to these specific instances, Johnson, failed to quantify the frequency of the harassment in any meaningful way, or describe how the alleged

harassment made her feel.  On this record, the court is hard-pressed to conclude that a reasonable jury could find that the conduct was subjectively offensive.

Defendants also challenge whether a reasonable jury could find Fabianski's alleged behavior *objectively* offensive and severe or pervasive, largely on the basis that the specific incidents were too few and isolated to meet this requirement.  (Defs.' Opening Br. (dkt. #18) 27-28.)  As described above, for purposes of Congleton's Title VII claim, the court may consider the full history of Fabianski's interactions with Congleton, including the period from 2002 through 2007, when Fabianski was her direct supervisor on her regularly scheduled shift.  For purposes of the plaintiffs' respective equal protection claims asserted against Fabianski individually, however, plaintiffs concede that only instances of harassment *after* June 2010 are relevant.

On the objectively offensive prong, "[c]ourts look to several factors to determine whether alleged harassment is objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance."  *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806–07 (7th Cir. 2000)); *see Smith v. Sheahan*, 189 F.3d 529, 533–34 (7th Cir. 1999) (citing same factors for determining whether the conduct is severe or pervasive).

The main thrust of defendants' argument is that plaintiffs' allegations of harassment and offensive behavior are too "general" to survive summary judgment.  Contrary to defendant's assertions, plaintiffs' allegations are not like those present in *Albiero v. City of*

*Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001), in which plaintiff Albiero simply stated generally that he was treated differently than other similarly situated landlords, without providing evidence in support. The plaintiffs here described specific statements made by Fabianski, and compared his treatment of them and other female correctional officers with that of male co-workers. Moreover, in *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), the Seventh Circuit expressly overruled *Albiero* and other cases "to the extent that they suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute." *Id.* at 968.

Defendants similarly cite *Bordelon v. Board of Education of the City of Chicago*, 811 F.3d 984, 991 (7th Cir. 2016), for support, but that case is also distinguishable. In *Bordelon*, the Seventh Circuit affirmed the district court's decision to disregard the plaintiff's general statement that older principals were treated in a discriminatory manner without offering "specific facts" to support this conclusion. If plaintiffs simply said, Fabianski treated women differently than men, than the court would agree that this testimony would be conclusory, and insufficient to move this case past summary judgment, but plaintiffs (or at least Congleton) attribute specific statements to Fabianski and affirmatively aver that he did not use that same or similar language in addressing male co-workers.

Defendants also argue that plaintiffs' allegations are similar to those in *McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004), in which the court found that the alleged harassment was not objectively offensive to support a hostile work environment claim. The court agrees that if Fabianski were simply "standoffish" or "unfriendly," like the defendant in *McKenzie*, then the evidence would be insufficient to establish an

objectively hostile work environment, *id.* at 625, but again, Congleton avers that Fabianski cursed at her, standing in close proximity, on at least a weekly basis, over a several year period of time. *See Valentine v. City of Chi.*, 452 F.3d 670, 681-82 (7th Cir. 2006) (relying on evidence that the alleged harassment was "very frequent," "humiliating," and that the "remarks were stated directly to the plaintiff," instead of simply heard secondhand sufficient to find the objectively offensive element satisfied for purposes of summary judgment). At least on the record before it on summary judgment, therefore, the court finds that Congleton's account provides a sufficient basis for a reasonable jury to find Fabianski's conduct objectively offensive and sufficiently severe or pervasive to support a Title VII hostile work environment claim.

As defendants point out, however, Congleton's regular interactions with Fabianski ceased in 2007; after that, while she worked a sporadic overtime shift on his watch, he was no longer the supervisor on her regularly-scheduled shift, except for a short period of time in 2012 when the schedule changed and Congleton had to a few days a week with Fabianski.[7] At most, therefore, Congleton raises a concern about a possible hostile work environment after Fabianski's promotion to the Assistant Jail Administrator position. Congleton's delay in raising a formal complaint with her employer or bringing a claim against Fabianski earlier is understandable: she managed to gain seniority and move off of Fabianski's shift, thus distancing herself from her alleged harasser. Only when Fabianski was to be promoted to a role that would again place her in his supervisory path on a regular

---

[7] Congleton does not provide any specific examples of harassing behavior during this period of time.

28

basis did Congleton sound the alarm. Indeed, her fear of renewed harassment may have been well-founded given her history with Congleton, and especially in light of her testimony that Fabianski stated, looking directly at her, "Once I become jail administrator, I'm going to fucking start cleaning house." (Pls.' PFOFs (dkt. #34) ¶ 29.) Still, in the absence of other, more overt, sexist, or explicit threats or evidence of regular contact with Fabianski during the period of time relevant to her equal protection claim, Congleton's general concern and this lone, more contemporaneous statement forms an insufficient basis for a reasonable jury to find that Fabianski's alleged conduct was objectively offensive after June 2010.

As for Johnson, even if the court were to consider the *full* history of her interactions with Fabianski, as opposed to just the period after June 2010, her evidence falls far short of demonstrating an equal protection claim. As detailed above, Johnson alleges that Fabianski treated female employees differently than male employees, and with respect to his treatment of her, recounts two instances -- one in 2002 and one in 2013 -- when he spoke to her in a disparaging manner. On this record, the court concludes that a reasonable jury could not find his behavior objectively offense, nor alternatively, sufficiently severe or pervasive to support her remaining equal protection claim.

### B. Plaintiffs' Sex as Reason for Harassment

In this case, plaintiffs do not contend that Fabianski made sex-specific, derogatory comments to them; rather, they contend that his offensive behavior was motivated by the fact that they are women. Contrary to defendant's apparent suggestion, however,

> Harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. . . . Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion] . . . because of . . . sex.*"

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).

In support of their motion for summary judgment, defendants point to evidence that: (1) Fabianski was "at times, rude and did not get along with several male employees during period of his employment with the County"; and (2) "it is well documented that Fabianski got along with and treated female employees, including the Plaintiffs, with respect." (Defs.' Opening Br. (dkt. #18) 31.) In contrast, plaintiff Congleton points to her own experience, as well as those of other women. This included not just the testimony of plaintiff that Fabianski did treat women more harshly than men but observations of other co-workers - - namely Sergeant Bill Skubal and Sergeant Rita Wege. Specifically, plaintiffs recount differential treatment in how he greeted and otherwise interacted with some female correctional officers - - treating them harshly in front of inmates and other correctional officers.

While the record would certainly support a finding that Fabianski got along well with female officers supervising him, this does not necessarily foreclose a finding that he treated female correctional officers that he supervised in a *more* disparaging manner then their male counterparts. *See Bohen v. City of E. Chi., Ind.*, 799 F.2d 1180, 1187 (7th Cir.

1986) ("An equal protection plaintiff therefore need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class is by itself enough."). The court is reminded of the late Green Bay Packer defensive lineman Henry Jordan's description of his Hall-of-Fame coach Vince Lombardi, "He treats us all the same – - like dogs."[8] Perhaps the jury will find that Fabianski acted similarly, being equally rude to both men and women in subordinate positions. On the record at summary judgment, however, plaintiff Congleton has put forth sufficient evidence from which a reasonable jury *might* conclude that Congleton's sex was at least a motivating factor for differentially adverse treatment, thereby supporting her Title VII hostile work environment claim.

## C. Employer Liability

Finally, defendants argue that "the County cannot be liable to Plaintiffs on their hostile work environment claims because they failed to report the alleged harassment when it was allegedly happening." (Defs.' Opening Br. (dkt. #18) 34.) Of course, *only* the County, as plaintiffs' employer, can be held liable for a hostile work environment claim under Title VII. *See, e.g.*, *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998). But to demonstrate a Title VII hostile work environment claim, the County is correct that

---

[8] Jerry Kramer, *Winning Wasn't Everything*, N.Y. Times, Jan. 24, 1997, *available at* www.nytimes.com/ref/Opinion/06opclassic.html. While this line has been oft quoted, it is quoted here from an opinion piece by Jordan's teammate and author, Jerry Kramer, published in the *New York Times*. Kramer goes on to observe, "It was a funny line, but wildly inaccurate. Lombardi's genius was that he treated us all differently." *Id.* Whether or not liable, the case against the County may or may not turn on whether the trier of fact finds that Fabianski appreciated the value in the latter.

Congleton must put forth sufficient evidence from which a reasonable jury could find a basis for employer liability. Specifically, Congleton must show either "(1) that a supervisor participated in the harassment that created the hostile work environment *or* (2) that [the employer] was negligent in discovering or remedying harassment by his coworkers." *Montgomery v. Am. Airlines*, 626 F.3d 382, 390 (7th Cir. 2010) (emphasis added).

While Fabianski was the lead corrections officers and, thus, Congleton's regularly-scheduled shift supervisor for roughly a five-year period of time, he was not her "supervisor" for purposes of analyzing employer liability under Title VII. *See Vance*, 133 S. Ct. at 2439 (limiting the definition of "supervisor" to those who have the authority to effect a "significant change in employment status, such as hiring, firing, failing to promote reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). This leaves only a single avenue for liability under Title VII: the County "failed to have and enforce a reasonable policy for preventing harassment." *Montgomery*, 626 F.3d at 391 (quoting *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006)).

As best the court can discern, defendants' argument on this prong hinges on the County's harassment policy defense. The Seventh Circuit has explained that:

> When no tangible employment action is taken against the employee in the course of the harassment, an employer may raise an affirmative defense to liability that must be proved by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Passananti v. Cook County*, 689 F.3d 655, 670 (7th Cir. 2012),

Taking these two requirements out of order, defendants contend that summary judgment is warranted because Congleton delayed in formally complaining about Fabianski's treatment of her. Certainly, Congleton's delay in raising a concern sufficient to place the County on notice of a harassment (at least based on her sex) may limit the scope of her damages, as even plaintiff appears to concede in her opposition brief. (*See* Pls.' Opp'n (dkt. #32) 9 (conceding that only "a subset" of Congleton's claims are actionable, and specifically describing "Charbarneau's sham investigation and improper exoneration of Fabianski in November, 2013 and Congleton's constructive demotion," as being within the limitations period).) In other words, Congleton will not be able to claim damages based on the harassment she experienced from roughly 2002 through 2007 because the County was not aware of the harassment at that time. Instead, Congleton's damages claim will be limited to the injury she suffered based on the County's alleged failure to conduct a reasonable investigation and forcing her transfer to a lower paying job.

As for proof that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," defendants principally argue that *any* investigative action triggers the defense. (Defs.' Reply (dkt. #38) 18-19.) In support, defendants direct the court to *Montgomery v. American Airlines*, 626 F.3d 382 (7th Cir. 2010), in which the court explained that "[a]n employer can generally avoid liability for a hostile work environment if it promptly investigates complaints made by the plaintiff and acted to stop the harassing behavior." *Montgomery*, 626 F.3d at 392. Defendants represent that in *Montgomery*, the Seventh Circuit affirmed "summary judgment for employer that

conducted a prompt investigation of the employee's complaint and determined that employee was not subject to discrimination." (Defs.' Reply (dkt. #38) 19.) Not true.[9] In *Montgomery*, the court affirmed summary judgment on the basis that the plaintiff had failed to "explicitly complain[] about racial harassment and racial discrimination" or offer evidence "allowing a reasonable inference of the alleged racial harassment." *Id.* at 391-92. In other words, the fact that the employer in *Montgomery* simply acted promptly to conduct an investigation was *not* dispositive; rather, it was the fact that the plaintiff failed to alert his employer of racial harassment that warranted summary judgment.

In contrast here, Congleton adequately advised Charbarneau of her complaint of harassment based on sex and the names of others who would substantiate her claim. While Charbarneau promptly commenced an investigation, she ultimately concluded the Congleton's complaint was unsubstantiated. Based on this *and* the testimony of differential treatment, therefore, a trier of fact might find that the County failed to take adequate steps to prevent the alleged harassment. Of course, a reasonable jury may ultimately credit Charbarneau's original finding on the evidence before her, but the mere fact that she conducted an investigation does not insulate the County from liability under Title VII. On the contrary, requiring a trial to decide this issue is consistent with the Supreme Court case originally setting forth this affirmative defense. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (rejecting the employer's argument that "the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability.

---

[9] The court expects better of counsel going forward.

While those facts are plainly relevant, the situation before us demonstrates why they are not necessarily dispositive.").

### III. Section 1983 Equal Protection Clause Claims Against Other Individual Defendants

In addition to the Title VII claim brought against the County, plaintiffs also assert equal protection claims against the individual defendants under 42 U.S.C. § 1983. Having determined that plaintiffs have failed to put forth sufficient evidence to support a finding that defendant Fabianski's behavior was objectively offensive and severe or pervasive during the relevant period of time for statute of limitations purposes to find him individually liable, the court need only address defendants' arguments for judgment in favor of the other individual defendants.[10]

In their opposition brief, plaintiffs withdraw their § 1983 claims against the County and individual defendants Sweeney and Hartman. (Pls.' Opp'n (dkt. #32) 9.) As for defendants Charbarneau and Neuman, they contend that these claims fail for lack of evidence of harassment. (Defs.' Opening Br. (dkt. #18) 39.) A central tenant of any §

---

[10] Defendants also assert that plaintiffs' claims against Fabianski fail because he was not acting under color of state law. The court rejects this basis for summary judgment for two main reasons: (1) defendants conflate the supervisory requirement for purposes of implicating employer liability under Title VII with the color of state law requirement under § 1983, *see Sommerfield v. City of Chi.*, No. 08 C 3025, 2011 WL 4553021, at *2 (N.D. Ill. Sept. 29, 2011) (explaining that "the relevant inquiry under §§ 1981 and 1983 is whether [defendant] was acting under the color of state law, not whether he was a supervisor"); and (2) plaintiffs put forth sufficient evidence that Fabianski acted in his role as the Lead Corrections Officer, rank as sergeant and ultimately Assistant Jail Administrator in carrying out his alleged offensive behavior towards plaintiffs and other women, *see Dean v. Parker*, No. 07-C-492, 2008 WL 5101692, at *12 (E.D. Wis. Nov. 25, 2008) (finding defendant's "position as a sergeant correctional officer gave [defendant] a certain measure of authority over [plaintiff]," even though defendant was not plaintiff's "supervisor in a traditional sense").

1983 claim is that "a plaintiff must establish defendants' personal responsibility for the claimed deprivation of a constitutional right." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). Any claim asserted against Charbarneau and Neuman must, therefore, be based on their own actions or inactions, not that of Fabianski's. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." (internal citation and quotation marks omitted)).

Tellingly, plaintiffs' response to this argument is limited to one sentence, quoting *Bohen v. City of East Chicago, Indiana*, 799 F.2d 1180, 1187 (7th Cir. 1986), plaintiffs maintain that an equal protection claim can arise "by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination." (Pls.' Opp'n (dkt. #32) 39.) The language on which plaintiffs rely comes from a discussion of the requirement of demonstrating employer liability under Title VII. *Bohen*, 799 F.2d at 1187 (citing as "accord" *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)). In a separate section of the *Bohen* opinion, the Seventh Circuit sets forth the proper standard under § 1983 for demonstrating municipal liability, namely that "actions of a state entity's employees are attributed to the state entity itself if those actions are in furtherance of the entity's policy or custom." *Id.* at 1188 (internal citation and quotation marks omitted). Regardless of whether *Bohen* could be read as suggesting a different standard of liability for a governmental employer under § 1983, however, *Bohen* does *not* address the standard for

individual liability of *other* employees who are not alleged to have engaged in harassment themselves.

Even fully crediting plaintiffs' theory that Charbarneau's investigation was insufficient, plaintiffs have put forth no evidence permitting a rational trier of fact to find that Charbarneau's conduct amounts to deliberate indifference, necessary to satisfy the personal responsibility requirement under § 1983. As for Johnson's claim against defendant Neuman, he was not even hired by the County to take over the position of Jail Administrator until after Charbarneau's investigation, and well after all of Fabianski's alleged harassment of Johnson (or, at least, Johnson failed to come forward with any evidence of harassment extending into 2014). In fact, the timing simply does not allow for a theory that he acted with deliberate indifference in failing to correct Fabianski's behavior. Moreover, Johnson failed to put forth evidence that Neuman personally discriminated against her based on sex. Instead, Johnson claims that Neuman retaliated against her for complaining about harassment, but that claim also fails as a matter of law for the reasons described below.

## IV. Retaliation Claims

### A. Title VII Claim

Title VII also "protects persons not just from certain forms of job discrimination [and harassment], but from retaliation for complaining about the types of discrimination it prohibits." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); 42 U.S.C. § 2000e–3(a). To prevail on a claim of retaliation, a plaintiff must prove that she:

(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice. *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000).

Defendants contend that summary judgment is warranted on plaintiff Congleton's Title VII retaliation claim because no evidence was advanced to permit a finding that "she suffered an adverse employment action or any causal connection between her protected activity and the alleged adverse action." (Defs.' Opening Br. (dkt. #18) 45.) In particular, defendants argue that her decision to transfer to another department within the County was plainly voluntary, rather than the result of an adverse employment action. Anticipating plaintiff's assertion that her demotion was *not* voluntary, but rather constituted a "constructive demotion" (similar to a "constructive discharge"), defendants argue in the alternative that this claim fails because there is no evidence of her being harassed at the time she elected to transfer to another department. Rather, Congleton simply anticipated harassment by Fabianski based on his promotion.

Whether or not Congleton's demotion ultimately constitutes a "constructive demotion" is a moot point in any event, because her claim clearly fails on the third prong, which requires proof that the adverse employment action was caused by her opposition to the unlawful employment practice. Here, Congleton has failed to put forth any such evidence. Other than using the language "retaliatory" in the context of describing a "constructive demotion claim as a damages issue," Congleton has even failed to develop an argument that the County retaliated against her for *complaining* about Fabianski's

harassment by requiring her to transfer. (*See* Pls.' Opp'n (dkt. #32) 40-41.) At most, Congleton can argue that her decision to transfer to another department was because of the County's failure to take action against Fabianski. Accordingly, while Congleton may proceed with her straight-up Title VII hostile work environment claim, and seek damages based on a constructive demotion theory, there is *no* basis for finding that the County retaliated because she complained about harassment.[11]

Johnson's claim similarly fails. In support, Johnson points to a conversation with Neuman, shortly after he stepped into the Jail Administrator position, in which he told her, she was "not a team player and that he would not have that in his department," and from which Johnson inferred, "[t]his was a reference to [her] previous complaints about Sergeant Fabianski which she had made to Juel and Charbarneau." (Pls.' Resp. to Defs.' PFOFs (dkt. #39) ¶ 162.) Johnson also avers that when asked if she had a problem with any coworkers or supervisors, she specifically told him of her "history with Sergeant Fabianski," including that she had previously complained to Juel and Charbarneau, but nothing had been done. (*Id.*)

Even crediting Johnson's account and all reasonable inferences from it, however, she fails to raise a genuine issue of material fact from which a reasonable jury could conclude that the County's termination of Johnson's employment almost a year later was not due to

---

[11] Theoretically perhaps, Congleton might have argued that by offering her the option of transferring to a different, lower position rather than work under Fabianski, the County was acting in a retaliatory fashion, but without first finding that the County should have credited Congleton's claims of harassment, an element of her hostile work environment claim, the County's offer -- itself responding to Congleton's request -- was simply one of accommodation, not retaliation.

abuse of the sick leave policy nor that the evidence of her abuse of sick time and insubordination was a pretext. Indeed, Johnson's termination occurred one year after she complained about Fabianski's behavior (or, perhaps more appropriately characterized, participated in Congleton's complaint), and ten months after Neuman told her to be a team player. Even if a trier of fact could infer after this length of time without any further intervening incidents that her complaints about Fabianski's harassment motivated Neuman's decision to investigate her sick leave and begin the process for terminating her employment, plaintiff has failed to put forth evidence demonstrating that but for her engaging in protected activity, she would not have been terminated. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."). To the contrary, the undisputed facts that Sheriff Hartman was not aware of Johnson's complaints about Fabianski, and that he conducted his own investigation into her abuse of sick leave policy before terminating her forecloses a finding of but-for causation, which would undermine even a "cat's paw" theory of liability. *See, e.g.*, *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015) ("[T]he chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee." (internal citation and quotation marks omitted)). In other words, Johnson has failed to raise a genuine issue of fact that her abuse of sick leave and insubordination did not provide an independent, legitimate basis for her termination.

**B. Equal Protection Claim**

Plaintiffs lastly bring a claim against the County for retaliation based on plaintiffs' respective separation from their jail employment. (Pls.' Opp'n (dkt. #32) 7.) These claims fail for the same reason as plaintiffs' Title VII retaliation claim, and for two other independent reasons. First, having withdrawn any *Monell* claim against the County for sex discrimination under the Equal Protection Clause, plaintiffs fail to put forth any evidence that plaintiffs' injuries can be traced to a policy, custom or practice. This dooms any claim asserted against the County for retaliation under the Equal Protection Clause. Second, and perhaps more critically, there is *no* basis in the case law for an equal protection retaliation claim.

To their credit, plaintiffs concede that this theory is "novel." (Pls.' Opp'n (dkt. #32) 7-8.) The Seventh Circuit has repeatedly held that "the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but *not* the equal protection clause." *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (emphasis added); *see also Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996) ("We do not imply, however, that retaliation claims arise under the Equal Protection Clause. That clause does not establish a general right to be free from retaliation."); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause.").

Recognizing this line of cases, plaintiffs nevertheless argue that the Supreme Court's more recent opinion in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), opens

the door to an equal protection retaliation claim. In *Jackson*, the Court held that Title IX contemplates a claim for retaliation. *Id.* at 173-74. Plaintiffs rely on language in that opinion stating that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.* There is no indication, however, that the Court intended its holding to extend beyond the specific Title IX claim at issue in *Jackson*.

Regardless, courts have reiterated since *Jackson* that a retaliation claim under the Equal Protection Clause is *not* available, including the Seventh Circuit. *See, e.g.*, *Tate v. Ancell*, 551 F. App'x 877, 898 (7th Cir. 2014) ("[W]e have repeatedly held that retaliation for one's efforts to oppose unlawful discrimination may be redressed under the First Amendment or Title VII, but not under the equal protection clause of the Fourteenth Amendment."); *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1236 n.7 (8th Cir. 2013) (citing *Boyd* for proposition that there is no retaliation claim under the equal protection clause); *Gibbons v. Vill. of Sauk Vill.*, No. 15 CV 4950, 2016 WL 1746160, at *3 (N.D. Ill. May 3, 2016) (same).

# ORDER

IT IS ORDERED that:

1) Defendants Oneida County, Keith Fabianski, Lisa Charbarneau, John Sweeney, Grady Hartman and Marc Neuman's motion for summary judgment (dkt. #17) is GRANTED IN PART AND DENIED IN PART. The motion is denied with respect to plaintiff Tracy Congleton's Title VII hostile work environment claim asserted against defendant Oneida County; in all other respects, the motion is granted.

2) Plaintiffs Tracy Congleton and Rita Johnson's motion to strike portions of defendants' reply brief (dkt. #41) is DENIED as unnecessary.

Entered this 13th day of October, 2017.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge